Pirosko Between May 24th and July 23rd, 2016 Good morning, your honors. May it please the court, I'm Wendy Overmeyer with the Federal Public Defender for the Appellant Joseph Pirosko. And I'd like five minutes for rebuttal. The search warrant affidavit in this case, and countless others, rests entirely on And the affidavit here represents a pattern of these affidavits that we see over and over again in these types of cases. And we sought discovery of this untested software by asking the district court in a motion to compel for the software, which the district court denied. And by testing the software, Pirosko had an expert ready and waiting to test the software to see a number of unknowns, to see if he was unconstitutionally investigated, whether the software is reliable, whether the evidence may be tainted somehow by the investigative software, whether it can manipulate data on his computer or override his shared settings in any way. And the... Do you present any evidence of any of those possibilities? In this case, Pirosko had his shared settings consistent with how a user would try and disable sharing. Now, admittedly, it was not set all the way to zero in this case. It was set, I believe, down to about one instead of zero. So that's an extremely low bandwidth setting, and I'm not a forensic expert, but it's an extremely low bandwidth setting when the setting is set that low. So there's a question of how here the Nebraska Department of Justice could have downloaded so many images from his computer, given the low amount of bandwidth and the relatively short amount of time. Again, we don't know the time it took to download these images. That was not included in the affidavit or in the discovery so far. And again, this is a pattern. Do you have a line on the Budziak, if I'm... I'm not sure how to pronounce it either. But there, there were specific pieces of evidence, specific explanations of the way images were used, portions of images were drawn from different computers, and evidence that would suggest that there was a problem. I think my question is, what is in this record that we could say grounds the ability for you to ask for this information in a way that's more than just a conclusory request, I get to look at it? Yes, in this case, again, it goes back to those shared settings that were reduced almost to zero, and that limited bandwidth, and the ability to upload or download, I guess is the correct term, so many images from Perosco's computer. That was the question here. Perosco always denied distribution in this case, denied it in his plea and also his sentencing. That was the major point of contention. Receipt was generally admitted to. So it's that issue of distribution, which is similar to BOOZIAC. Now BOOZIAC had a different software. I'm sorry, I didn't mean to interrupt your... Please finish if you... On the BOOZIAC. That's what I was going to say. They had a slightly different software, I believe. It was EP2P, here at Shiraz LE. We later learned that was the name of some of the software that was used. But the issues are similar with the shared settings being reduced a significant amount or almost to zero. But your client doesn't deny receipt, correct? Correct. He pled, admitted to receipt. So doesn't the government have those images through their own mechanism, and they charge... There's an issue about the numbers of pictures, 600 or more or not. But if the government has them, then wouldn't there be the possibility of distribution? And again, I'm not an expert in this area either, so I apologize for lack of technical terms here. But wouldn't there be the possibility that putting them on the shared file would mean that anybody could get them? Because after all, the government got them. I think it's important to distinguish the images that the government found on the computer after it was seized, and the images the government claims to have downloaded during the time before they obtained the search warrant in the case. And he's convicted primarily on the images that were on the computer, found on the computer when it was seized, when the warrant was executed. You're not claiming that there was a false statement in the affidavit, are you? We're claiming there was a reckless disregard for the truth by omitting information in the affidavit. And first and most importantly is the name of the software. Defense counsel were unable to even look up the name of the software to see if other courts have reviewed it. Has this software been found to be reliable by another court? We're completely without any information to verify the government's claims of reliability for this software. They don't name it, but they make all kinds of claims for reliability in pages, I think it's 11 to 13 of Agent Sexton's affidavit. He claims it's extremely reliable, nearly every case is verified, and has an extremely high degree of accuracy. It only reports what's available to the general public, and we're unable to determine if those claims are true or not. And there's a number of other unknowns. There's no peer review of this software. There's no known error rate. There's no statistics of use. We don't know the information of how it's maintained, how agents are trained. If Agent Sexton had the training to use this software. All of those are unknowns. We weren't given hearings, we weren't given any type of discovery, and it practically guarantees convictions in these cases because there's nothing the defendants can do to challenge the warrants. And then once the warrants are executed, obviously the evidence is found, and it's very difficult to go to trial with that type of evidence, particularly in these types of cases, it's very difficult to go to trial. So do you know what pictures the government had before they undertook the search? A few are listed specifically in the affidavit. I think they set out five, maybe five to seven, I can't say offhand. But they list the fact that they got around 40 images. They don't list out 40 by name, or with the file name where they list out the whole address where they found it on the computer. But they did list about five or seven, I believe. I may be mixing up cases. There is a similar case. I did want to let this court know there's a similar case pending right now. It's Paul Schumacher. It's 14-3576. There was going to be an argument tomorrow, it was canceled. It's before a different panel, but it is the same issue where there's... In this court. In this court, where there's an issue of suppression issues to do with this software. So I just wanted to make sure this panel was aware of that. Thank you. Educate me on the materiality of the discussion that we're having, receipt versus distribution. It's an or in the statute. Yes. So if he's convicted of the receipt, are the discussions that we're having about distribution, aren't they just related to sentencing as opposed to conviction? I think the government will stand up and argue that he was convicted of distribution. So there is an issue there. He was convicted of the statutory provision that has receipt or distribution. Yes. And that's correct, isn't it? That's correct. So tell me what the argument then really addresses. For materiality? Yes. Okay. For materiality, the charges here, whether they're receipt or distribution, they're premised on the software functioning in the way the government claimed in its affidavit. They wouldn't have had the evidence of receipts had they not tracked him, had they not gone into his computer without a warrant through this direct connection of this unknown software. They would not have had the evidence they had for receipts had they not used this software. The entire case is premised on this initial use of the software by Agent Sexton to track Perasco over 19 weeks at these various locations. So it's material because all of that evidence obtained with the software or the software that led to Perasco being in that motel room, all of that would be admissible at trial. Images and evidence obtained through the use of PeerSpecter software, that's the kind of suite of programs that the software belongs to, has been deemed admissible in these cases. So if that software is functioning differently than what they proclaim, that isn't an issue for trial. That can make evidence more or less likely as to distribution or a receipt to a certain extent, I suppose. If he was receiving things online or was he getting it from another source and then putting it on his computer, those are all issues to be maintained. It's material to the receipt conviction period? And distribution. And distribution. And distribution is a big issue for sentencing as well. It can add five levels to a sentence, which is significant. These sentences are already so high given the guidelines. So distribution is a common fight at sentencing in these types of cases. So if your client had not pleaded guilty and had gone to trial, are you saying then that at trial you would be able to examine the government witnesses and force them to disclose the software and the error rate and so forth? I think that's certainly something we would try and do at trial, but more often we would try and do that pretrial, which is what we did here, and resolve the issues before it's necessary to go to trial and to save those resources for where it's really needed. Here it's best done pretrial because if we have the software, we can examine it and see is that affidavit truthful? Does it do the things that they're saying it can do? And does it do things? They're saying it can't do these things, A, B, C. Well, can it do any of those things? We don't know. All we have here is the affidavit of the software's creator, and so he's obviously a little bit of a biased source, and he doesn't also cite any studies. What about the government's argument that people who are engaged in computer sharing of child pornography are tech-savvy, and that once they know this information that you're seeking, that they will be able to find ways around being discovered, and so there's a part that might be called a qualified privilege? I think the government's concerns can be, first of all, satisfied by a protective order, a protection order that would seal the information about the software and just keep it within the party itself. As for... It would allow the defendant to know the information, and I assume, right? Yes, yes, we would let the defendant know. And therefore, what would keep the defendant from sharing that? Just there would be a protective order? A protection order. Saying that he couldn't share it. And the government also offers no alternative way to verify this information, and I think they say these people are very tech-savvy, yet they still keep going on these peer-to-peer networks where it's known that the government is also going on these peer-to-peer networks and catching people, so it's not... People know that they're going on there to catch people, but they still continue to do it. So I don't know that they're quite as tech-savvy as the government would make out. So the Boudziak case, was the information that was required to be disclosed, is that available to you? The information... That was required about the computer software, did you... Were you able, actually, to get access to that computer software information? No. That's what we're asking for. We're asking for the software. I mean, from the Boudziak case, because there was an order of disclosure there, can you, in your case, make use of the Boudziak information, or is it sealed? It's a different program. Sorry. And it's also sealed. There was also a protection order in Boudziak, and it's a different program that was used. As far as I know, it's not the PeerSpectre program. It's called eP2P that was used in Boudziak. And here, we're seeking Shiraza LE, a law enforcement version, and Child Protective Systems Database, I believe, were two of the primary pieces of software. And do you know what the result was in the Boudziak case after disclosure? Yes. The issue was litigated a little bit further, and they dropped the distribution counts, and he pled to, I believe, possession, and was given time served. Thank you. Your red light is on on that one. Another question. Thank you. Good morning, Your Honors. May it please the Court. My name is Laura Ford, and I'm here on behalf of the United States. And I'd like to begin by addressing a point that Judge Moore and Judge Stranch have raised with respect to the issue about receipt. As Perasco's attorney has acknowledged that he generally admitted that. And that's significant because the Boudziak case, there was not receipt at issue in that case. He was only charged with the distribution under 2252 paragraph A2. And as Judge Stranch has recognized, under that statute, you can have a receipt or distribution. You don't have to have both. You can. But there is an independent basis for conviction in this case that was not present in the Boudziak case. Would the defendant be entitled to review this information, though, at the time of sentencing since he got an enhanced amount for the distribution? Did he not? He did. Under Rule 16, I would say no because the Likens case that we cited discusses that material to the defense means that it addresses the government's case-in-chief. So I would take that to mean that it doesn't mean that that is relevant to sentencing. But why isn't it relevant to the adding five levels for a distribution? And wouldn't you be able to discover things that are material to a sentencing issue? Your Honor, I'm not really familiar with discovery rule with respect to sentencing. Certainly in the pre-trial context, I don't think that satisfies the materiality requirement. And the problem with this... Materiality to his defense. To his defense. Correct, Your Honor. And the problem with this case is Perosco is focusing on everything that he didn't get rather than focusing on the significance of what he did receive, including the activity logs, which would show, that's automatically generated, that shows the activity between      And the problem with this... Materiality to his defense. To his defense. And that would dispel any question about whether there's any type of potential for modification. And in this case, he didn't have to take the software developer's word for it, or the agent that was using the software, because you have the activity logs in this case. You have his admission, essentially, that he didn't reduce that slot down to zero. And the plain language of the settings page that he was on said that to turn off the sharing, you have to reduce it down to zero. And even at sentencing, his attorney admitted at page ID 755 that he could have reduced it down to zero. He didn't. He had it at one. And you also... If you reduce it to zero, then you're no longer doing sharing, right? Right. And I apologize for my lack of knowledge here. So how could he be getting material through file sharing but not sharing it back? Wouldn't he be thrown off of the sharing group? I think the government's theory in this case was that he was trying to preserve the ability to download for himself, but not make a lot available. And I think there was a consistent pattern. The investigator in the complaint, I'm sorry, the search warrant talks about how he had a consistent pattern of having very little available for sharing. And then towards the end of the session, he'd have some available. And so the government's theory in this case was that he essentially was trying to preserve everything for himself while making a minimal amount available for sharing in this case. Well, suppose hypothetically that the government's methods are pretty faulty, let's say hypothetically, how would a defendant such as this defendant be able to present enough evidence to compel discovery of the program and other matters? Well, I think the activity logs would reflect if there was any type of tampering, which was not supported in this case. He also had access to his own hard drive, which would show the file creation, modification dates would have the GUID number that was assigned by this file sharing software. And I guess that's another distinction with the Bootsy Act case is the court noted that there was evidence in that case that possibly this different software overrode the defendant's settings. But here we have a defendant who's admitted that his settings still permitted a minimal amount of distribution in this case. And all the cases that he cites, not one of them helps him. The Bootsy Act case is distinguishable because you have a defendant here who was charged with receipt, which is an independent basis. The Neal case that he cites, there was a question about whether there was partial file downloads. We don't have that here. And I think it's significant that even after the court ordered a discovery redacted product manual in this case, the court ultimately denied the suppression motion. And that's found under United States versus Thomas, where the court denied suppression for Neal and two other defendants and found that there was no evidence that this same software gleaned anything other than that was available for file sharing. Also the Acasio case involving, again, the same software, I'd encourage the court to take a look at the docket in that case. Because about 10 days after ordering discovery of the source code in that case, the court ultimately denied the suppression motion. And that is a Western District of Texas case. The docket number is 3-11-CR-2728. It's record entry number 163. Page eight, the court finds that armed even with the source code, the defendant could not show that this software was accessing private files or that the use of it violated the Fourth Amendment. The only thing, and the same is true here, the only thing that it is accessing is information that Perasco has made available through sharing. And I would suggest to the court that if there was a false positive on this software, there would not have been files available to download. And so there's absolutely no case that Perasco has cited where a court has suppressed evidence based on alleged concerns with this software. And that's on the basis of the government's privilege? Is this the government, the core reason is that the government claims a privilege in this programming? Is that correct? That's the basis of the defense against the request for discovery? Oh, well, number one, we contend that he doesn't meet materiality, particularly given everything that was already available to him. And significantly, he's never shown, he's never argued that there was actual manipulation in this case. And he concedes that there was receipt. But yes, we also secondly argue that there is law enforcement privilege in this case because providing the software would open the floodgates to circumvention. The Sheradio case recognized that these users are fairly tech savvy. And in this software, basically what it does is it gives, it makes single source downloading the default. But the Gable case that Perasco cites has a really nice discussion about everything that is available on the file sharing network to the general public. They have the GUIDs. They have the IP address. They have the option of doing single source downloading. What they don't have is this universe of hash values that law enforcement has identified as child notable. And providing that, if the defense has access to that, then defendants could decide to try other files. They could change the hash values. And it's the functional equivalent of disclosing the hidden observation post. And there's a reason why we're citing... I understand the struggle because what you need to keep confidential is very important to continued law enforcement. The other side of the issue that the defendant raises is how do I know that this program does what it says it's doing and how do I know, as in Boudziak, that it's not doing something else and obtaining from a number of different computers a composite image that was not on my computer. So it's also tied to the problems of ownership. I'm struggling with understanding why the government has a privilege if it doesn't own the software, if the code is not its own. If I can get the wording correct, the source code is not its own. The licensing agreement is all that they have rather than ownership. You can understand the problem here because if it were just the government's complete ownership, then they should and would know how that computer investigation functions. But if it's just some computer expert out there who's created a new problem and puts in an affidavit that says it works, it works, it works, then how can someone defend against that? You understand my question? How do you hold the privilege for what is not your own? And what happens if it is not your own and a defendant can't find a way to understand what it's doing? And you've raised a number of issues in that question, Your Honor, and please let me know if I don't address all of them, but I'll start. Well, with respect to, there's an easy way for the defendant to be able to present some evidence. You have those logs that show exactly what happened between the computers that show that you're getting this information from the shared folder. You have access to the screenshots of the defendant, of what his settings were. And you also have access, you're going to give the defendant access to his computer so he can see the file creation dates, modification dates. With respect to the issue about the government not having possession of the source code, that's significant to the Rule 16 claim, but I would suggest that the fact that that is held by a company and is proprietary does not in any way diminish our concern with protecting the information. Does it diminish your right to claim privilege? I don't believe so. And I would suggest, I'd ask, the Brashear case actually involved a Rule 17 subpoena and the court did quash the subpoena in that case where the government did make a claim, and I believe that was the Pennsylvania State Police made the claim that, look, we don't have this. And the court did grant the motion to quash based on law enforcement privilege. So it... Under a Rule 17? Under Rule 17. Now, the court ultimately did not decide whether or not Pennsylvania had the source code, but I would suggest to the court that it doesn't in any way diminish the government's interest. And I think there's a lot of analogies to Title III cases. You know, the interception equipment might be created by a third party, but that doesn't mean that they get discovery of that. In a Title III case, they get the calls and they get the logs, but they don't get the mechanics for how that interception equipment functions. And they haven't cited any cases where that has occurred, where they've gotten discovery with that. Is there a Title III case that you would recommend as the best case to support your position here? I think the Van Horn case is instructive in that context. I do want to address the issue of why a protective order doesn't work in this case. Now, there has been discovery in a couple of cases, and I think it's significant that the courts in those cases ultimately have found the defendant's claims meritless on Fourth Amendment grounds. But the reason why it's not adequate to protect the government's interest is because we cannot be made whole through court-ordered sanctions. This isn't like a copyright or patent infringement case where perhaps the company can be made whole through monetary damages. If the information is leaked, it's over. If the defendants know what hash value that we are looking for, I'd suggest this defendant squarely fits into the type of defendant who is fairly tech-savvy, and that's reflective of the fact that he has very small amounts available for sharing and has modified his settings. Why doesn't the fact that he has that little bit show that he doesn't know what he's doing, that he really meant to take it to zero, but he took it to one instead? Well, I think that it shows that he is still trying to preserve the ability to download files. Because you can't download if your setting is zero? I don't know the answer to the question. I know that many of the file-sharing software you have to be sharing in order to download. I don't know if that's specifically how this network works, but that is common. This defendant, if you look at the pre-sentence report, he previously had child pornography on his computer when he was arrested for the offense in Germany, and his ex-wife spoke to the fact that he had a very sophisticated security system that the German investigators could not crack. I think he squarely fits within the type of tech-savvy defendant. He knew exactly what he was doing. He could have reduced his slot down to one. He didn't do that, admittedly, and I think that diminishes any claim that he did not have files available for downloading, for sharing. Is it possible to have a protective order that allows only the lawyer to see the information? It is, Your Honor, but I still think that there's a risk if this information is leaked that, again, we cannot be made whole by court-ordered sanctions, and I think that certainly goes to the weight of the government's interest in this case. In light of the evidence in this case that we had the logs that showed that there was no tampering of any sort, that he had his computer available to him to examine, and the fact that he admittedly had a small amount available for downloading, that certainly does not overcome the government's interest in protecting that information in this case. Thank you. Thank you, Your Honors. The government's argument raises a number of troubling concerns, the first and most important being that the end justifies the means here, because they found pornography on his computer. It doesn't matter what the affidavit says. It doesn't matter how they got there. We have evidence of receipt. The case is closed. It leaves these defendants without- But what they also, you know, I think we're all struggling with the same thing. What they also argue is that sufficient information was provided for this defendant to have come forward with evidence that there was a problem, and then we would be having a different discussion. We would be having a discussion of a real need to look into this software, that there was a problem with it, versus what is a more general request for information without any backup evidence based on the list of technical terms that, I'm sorry to say I can't remember, everything but the hashtags, evidently. So why doesn't that place the burden on your client to have done it, and how can you show that your client carried this burden? We did have an expert review all of the evidence given to us by the government, the hard drive, the logs, all of that information, and our expert still said that there were unanswerable questions he couldn't answer. How they downloaded these images over a low bandwidth, you know, he didn't know the amount of time it took him. He couldn't tell what the error rate is. He couldn't tell if it can manipulate data on a computer. There are many different things he couldn't tell. Your opponent says that the logs are the key. Why is that not correct? Well, the logs show, and my expert could say it better than I can, the logs show the sessions where the information was downloaded from the computer. What the logs don't show, again, is the software itself, how it's maintained, how people are trained in its usage. Again, the error rate of these things, they're claiming it's extremely accurate, it's extremely reliable. If you have the logs, wouldn't your client have been able to put some evidence into the record that indicated there was an error in his, in the case that was before him, and wouldn't that be the kind of evidence that would be necessary for the court to have ordered further investigation? With what our expert told us is that those logs did not give him enough information. You didn't have any basis to say that the logs had errors in them. Correct. He said the logs weren't sufficient information for the questions that we had. For him to make an evaluation of the error rate of usage of the entire program, or for you to make a determination of an error rate on your client, why wouldn't there have been sufficient information for the latter? I don't know offhand the technical reason why. I know the error rate is not just with this client, but it's overall as well. I mean, this has farther implications. Do we care what the error rate is for other people, or do we only care whether there were errors in your client's situation? Both. Both, I think. Because if there are error rates overall, and they're claiming that this is perfect and reliable, that every case is verified, and it's not, then that is a problem that's being presented to magistrate judges, and it's claiming that the software is better than it really is, that they can do more than it really is. And the defendants have no way to test that. Error rate doesn't have to be perfect. Error rate doesn't have to be perfect, but it has to be reliable and accurate. Is it a percent or something like that? I don't know the exact percent, but it would have to be, you know, for charges to be based on evidence obtained in a forensic way, that forensic method has to be deemed reliable and accurate. That's the basis of our system. And here, defendants are left without any way to verify the reliability of the software. The government hasn't done it themselves. I mean, they could have independent testing done of the software and publish a study and cite that study, and that would be enough. But the government hasn't done that here. There's no alternative for these defendants to check this evidence. Is there an analogy that's possible with dog sniffs that you would make or that you would reject in terms of error rates? Do you need to, you know, you represent defendants in all sorts of different cases. Is the error rate that you're seeking for the software similar to an error rate in dog sniff cases, and what's the law there? I think you can compare it with the dog sniff case. In the dog sniff case, you could get discovery of what's this dog's training? Has this dog gone through certification? You know, what's the handler's training? We don't have any of that here. We don't know what Agent Sexton's training was. We don't know how the dog, the software, what avenues it went through. But you could definitely find out what Agent Sexton's training was, couldn't you, by asking questions? We could if we had a hearing of some sort. We didn't have a hearing in this case, either on the motion to compel or the motion to suppress, so we were never able to cross-examine Agent Sexton. And did you ask for a hearing with Agent Sexton to be present? We asked for hearings, yes, and presumably he would be present as the principal agent in this case. And as far as protecting this information, we use the comparison with fingerprints. It's as though saying if criminals know that we're using their fingerprints, they're going to start wearing gloves. But defendants are allowed to test forensic methods. They're allowed to verify forensic methods, whether it be fingerprints or hair analysis or bite marks or things of that nature. And computer testing should be no different. Defendants should be allowed to examine and verify the claims made about computer forensic methods. Otherwise, their hands are tied and the adversarial process suffers. Thank you. Thank you both for your argument. The case will be submitted.